Charles Cr. Tierney, J.
This is an article 78 CPLR proceeding to review and annul a determination and order of the respondent City of New York Commission on Human Rights and to prohibit respondent from invoking statutory penalties for failure to comply with such order. The respondents cross-move for an order of this court enforcing their order and determination.
The facts are as follows:
The petitioner partnership is the owner of an apartment house located at 5555 Henry Hudson Parkway in The Bronx. In February, 1965, Mr. and Mrs. Seward Sweet executed a lease for Apartment 11F in that building for the period from February 15, 1965 to September 30, 1967.
On or about March 1,1966, Mrs. Sweet, in a conversation with John Shine, the superintendent of the building, told him that since her husband had changed jobs, they would be moving to Washington, D. C. in. May or June. Mr. Shine said he would *404 relay that information to Mr. Seligman, the managing agent. A few days later Mr. Shine told Mrs. Sweet to call Mr. Seligman.
On March 12, before Mrs. Sweet called Mr. Seligman, the superintendent brought a couple who lived in the building to see Apt. 11F.
On Monday, March 21, 1966, Mrs. Sweet called Mr. Seligman and advised him that she would move out by May 15,1966. She told him that she might be able to obtain a subtenant and was advised that either the Sweets or the management would get a tenant, but that any prospective tenant would have to be approved by the owner. .
On Thursday, March 24, a friend of the Sweets brought the complainant, Wesley T. Cobb, to see the apartment. He requested Mrs. Sweet to call Mr. Seligman to find out the procedure to be followed in applying for rental of the apartment.
On Friday, March 25, Mrs. Sweet called Mr. Seligman and asked if there had been any applicants for the apartment; he said there had been no applicants, but that some inquiries had been made. Mrs. Sweet then stated that she had a party who was interested in renting and asked what the requisite procedure was. Mr. Seligman asked the name of the interested party, his present address and his occupation. Mrs. Sweet replied that his name was Cobb, but she did not know what his occupation was now, nor where he resided. Mrs. Sweet then said that she would call her friend who would have the requested information and would then call Mr. Seligman back.
Mrs. Sweet called Mr. Cobb, obtained the requested information and called Mr. Seligman again. Mrs. Sweet explained that Mr. Cobb was Associate Director of the National Urban League. Mr. Seligman’s response was “ Oh that’s it ” and he then asked about Mr. Cobb’s salary. Mrs. Sweet did not know, Mr. Seligman then repeated his prior statement that any prospective tenant would have to be approved by the owners and, also, told her that some people would be coming to see the apartment over the week end. The remainder of the conversation related to the costs and requirements of terminating the Sweet lease.
On Saturday, March 26, Mr. Shine brought another couple who lived in the building to see the apartment. They returned the following day to take measurements.
On Monday morning, March 28, Mr. Shine advised Mrs. Sweet that the apartment had been rented. Mrs. Sweet called Mr. Seligman and asked him if Mr. Cobb was the tenant; he said that he was not and that Mr. Rueben Weiner, one of the owners, had sent someone to see the apartment while the Sweets were not' at home and had. rented it. - Mr., Seligman then discussed *405 the termination of the lease and the execution of the release papers.
On Saturday, March 26, Mr. Cobb had telephoned Mr. Shine and told him of his desire to rent Apartment 11F and asked how to go about it. Mr. Shine gave Mr. Cobb the telephone number of the managing agent, but Mr. Cobb was not successful in several attempts that day in reaching Mr. Seligman.
On Monday afternoon, March 28, Mr. Cobb was able to contact Mr. Seligman, who told him that Apartment 11F was no longer available, but that Mr. Cobb should send his name to Mr. Seligman, who would consider him for any apartments, available in the future.
On Wednesday, March 30, Mr. Cobb filed a complaint charging unlawful discrimination by the petitioner against him because of his race and color.
The respondents held an investigatory conference to gather additional facts relating to the alleged discrimination. Mr. Seligman advised them that Mr. Weiner, a copartner in the petitioner partnership, was out of town during the week end of March 26 and 27 and that when Mr. Weiner returned on March 28, he spoke to Mr. Seligman and informed him that the apartment was to be rented to Mr. Weiner’s father.
Mr. Cobb was then offered another apartment at a lower rental in the building and in addition he was offered ‘ ‘ first refusal on the next apartment ’ ’ that became available and ‘ ‘ a contribution of $100.00 toward the cost of moving from the apartment now available to the one that will become available. ’ ’ (Apartment 11F is a 4%-room apartment with one bathroom and a terrace on the 11th floor; the apartment offered to Mr. Cobb, Apartment 2J, was a 4%-room apartment with two bathrooms and no terrace on the second floor). Mr. Cobb refused the offer.
When the complaint was made, the respondents prohibited the petitioner from renting the apartment until the complaint was acted upon. The petitioner then refused to release the Sweets from the obligations of their lease.
The respondent commission, after a hearing, found, among other things, that petitioner had knowledge that Mr. Cobb was a Negro and that there had been illegal discrimination and ordered petitioner to release the Sweets from their lease and rent the apartment to Mr. Cobb.
The pertinent statute is section Bl-9.0 of the Administrative Code of the City of New York (as- amd. by Local Laws of City of N. Y., 1965, No. 97) which provides for judicial review of a determination of the City of New York Commission on Human Eights. That section provides in part that the commission’s *406 findings “as to the facts shall be conclusive if supported by sufficient evidence on the record considered as a whole.”
A thorough review of the entire record reveals that there is not sufficient evidence to support the factual findings and conclusions of the commission. ‘ ‘ A finding is supported by the evidence only when the evidence is so substantial that from it an inference of the existence of the fact found may be drawn reasonably. A mere scintilla of evidence sufficient to justify a suspicion is not sufficient to support a finding upon which legal rights and obligations are based. That requires ‘ such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.’ (Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 229.) ” (Matter of Stork Rest. v. Boland, 282 N. Y. 256, 273-274.)
There is in truth no evidence that petitioner or its agent knew that Mr. Cobb was a Negro. The partners of the petitioner partnership never saw Mr. Cobb, nor did their agent, and the managing agent never even spoke to him on the telephone until March 28, when Mr. Cobb was told that the apartment had already been rented. The commission’s decision states that its finding was based on the telephone conversation in which Mrs. Sweet told Mr. Seligman that Mr. Cobb was employed as the Associate Director of the National Urban League. The commission determined that since the National Urban League is ‘ ‘ concerned with the welfare and problems of minority groups most specifically the Negro ”, Mr. Seligman could easily have inferred and must have inferred that Mr. Cobb was a Negro, and the commission inferred from Mr. Seligman’s alleged inference that Mr. Cobb was discriminated against because of his race and color. The commission calls this inference on an inference “ a strong presumption ” that petitioner “ knew that Mr. Cobb was in all probability a Negro ” and states that “ there was no evidence offered to overcome this presumption”. The court is of the view that there was insufficient evidence to give rise to the “ presumption” in the first instance.
Further, the commission chose to construe and/or misconstrue the testimony that after the complaint was filed the petitioner landlord offered Mr. Cobb another 4%-room apartment in the building, which he rejected as being unsuitable, and offered him first option on the next vacant suitable apartment, plus $100 for moving expenses and that petitioner initiated a settlement discussion in an attempt to resolve amicably this dispute before the hearing; the commission found that “ the subsequent offer of the landlord of a second floor apartment was not made in good faith”. These facts would be equally amenable to an *407 opposite interpretation; that the landlord did not intend to discriminate against Negroes; that until the complaint was filed the landlord was unaware that Mr. Cobb was a Negro; and that the petitioner was acting in,good faith.
This court is not unaware of the fact that there is often discrimination against Negroes and other minority groups by some landlords and others in New York City. It is also aware of the fact that such discrimination is generally subtle and covert, that direct evidence of prejudice can rarely be presented, and that a finding of discrimination can usually only be based upon deduction or inference from a series or pattern of seemingly innocent acts taken together and viewed as a totality. However, no matter how urgent and inequitable the general problem of" discrimination in housing may be, in the instant matter the record, taken as a whole, does not contain sufficient evidence to support the factual findings of the commission. The dictates of justice and the law militate against sustaining an administrative determination which has as its only apparent support ‘ ‘ A mere scintilla of evidence sufficient to justify a suspicion ’ ’ (Matter of Stork Rest. v. Boland, supra, p. 273).
Accordingly, the application is granted and the cross motion is denied.