Chief Judge Breitel.
The New York City Commission of Human Rights appeals from the judicial overturning of its determination that Pace College (now Pace University) was guilty of discrimination against women on its faculty. The proceeding before it had been initiated by one Dr. Winsey, a faculty member, who contended that she had been discriminated against by Pace because she was a woman, resulting in her being denied promotion and tenure. She also appeals.
The commission, after a hearing, found that Pace had engaged in a practice of sex discrimination, and in particular had discriminated against Dr. Winsey. It had directed corrective action both generally to prevent discrimination in the faculty and particularly to redress the consequences of discrimination against Dr. Winsey. Special Term set aside the determination of the commission in a wide-ranging opinion, and the Appellate Division affirmed.
The issues are whether there was sufficient evidence, the test in reviewing this administrative action, to support the commission’s finding that there was a pattern of discrimination against women on the faculty of Pace and whether, in any event, there was sufficient evidence to support a finding that Dr. Winsey was discriminated against because she was a woman. More concretely, the issues can be restated whether the commission’s reliance on broad statistical data and analysis supported a finding of a pattern of discrimination, and whether there was sufficient evidence to support a finding, regardless of a pattern at Pace, of discrimination against Dr. Winsey because she was a woman and was assertive of her rights as she saw them, conduct not tolerated in a woman but which would have been tolerated or even expected of a man in similar circumstances.
*33 The order of the Appellate Division should be modified. There was insufficient evidence in the superficially plausible statistical data before the commission to sustain a finding of a pattern of discrimination or to warrant the extensive and intrusive “affirmative action program” imposed on Pace. On the other hand, unless the courts pre-empt the fact-finding responsibility of the administrative agency, as they may not, there was sufficient evidence which the commission could credit that Dr. Winsey was being treated differently than a man would have been because of her necessarily aggressive pursuit of promotion despite an acceptable teaching record at Pace.
The unlawful employment practices proceeding which was initiated by the complaint of Dr. Winsey is authorized by the New York City Administrative Code, and the statutory test for determinations by the administrative agency is sufficiency of the evidence to support them (§ Bl-9.0). There is a comparable State statute (Executive Law, art 15, especially § 298; cf., also, US Code, tit 42, § 2000e et seq., especially § 2000e-5, subd [f], par [1] [Title VII of the Civil Rights • Act of 1964]). Pace, founded as Pace Institute in 1906, is a once small but since grown larger university based in Manhattan in New York City. Dr. Winsey, one of a minority of women on the faculty, was an untenured member. At stake in the controversy was her promotion to a higher professional rank and the achievement of tenure. As with many of the universities in the Nation the infusion of significant proportions of women in Pace’s faculty did not begin until recently. Indeed, it was in 1960 that Pace employed its first woman faculty member. Of Pace’s faculty in 1971-1972, the academic year when the commission hearing was held, 20% of its 226 members were women, and they were clustered at the lower ranks of the faculty.
Dr. Winsey had been first employed by Pace in the 1966: 1967 academic year as an adjunct, part-time, associate professor in the Department of Speech. She holds a doctorate in cultural anthropology and a master’s degree in speech and human relations. At the time of her appointment, she had had one-and-a-half years’ full-time and approximately 11 years’ part-time teaching experience.
After two years, in 1968, Dr. Winsey was appointed, in part through the. efforts of the Dean of the School of Arts and Sciences, to a full-time teaching position as an associate *34 professor, in Pace’s new Social Science Department. Her efforts to obtain a full-time position in the Department of Speech had been unsuccessful. Dr. Winsey was told by the head of the Department of Speech that he did not like women around him because he could not use "four-letter” words in their presence. He also stated that he could not pay her as much as a man because it would "demoralize” his department.
Based on the testimony at the hearing, her prior teaching experience, her committee assignments, and her relatively high compensation, the commission concluded that Dr. Winsey was a highly-regarded and unusually successful teacher. There was, however, a report of an ad hoc curriculum committee chaired by Dr. Winsey, which produced a negative reaction. The report received mixed response from the faculty and particularly from the historians in the Social Science Department. The historians believed that in recommending a reduction in the number of required history courses, Dr. Winsey had "sold us down the river”. It is of background relevance that as in many schools of higher learning Pace was experiencing a period of contraction.
Beginning in the summer of 1969, there were conversations of a more or less amicable nature between Dr. Winsey and various administrators and faculty members concerning her promotion to full professor. Her inquiries began with the Dean of the School of Arts and Sciences, and then shifted to her department head when it was pointed out to her that that was the proper channel through which to advance her ambition. The department head referred the inquiry to the departmental committee on promotion, which was composed of men only. The committee reported adversely, and in fact criticized the earlier appointment of Dr. Winsey as an associate professor. In not recommending Dr. Winsey’s promotion the department head reported to the Dean that Dr. Winsey did not meet minimum requirements. He also stated that her background was too diversified, that she had no publications, and that other department members for various reasons resented her having attained an associate professorship and would therefore be "demoralized” if she were promoted further. At an interview with the department head, Dr. Winsey was told that the promotion committee had decided that she "wouldn’t be happy there”. Dr. Winsey protested, and stated, among other things, that she had received from the Dean advice that publication was not necessary for promotion, and had never *35 been advised that she lacked prerequisites to promotion or tenure. She told the department head that she planned to appeal his decision, but in fact she never prosecuted an appeal.
Despite the fact that, according to the Dean, it was proper for an applicant for promotion to appeal a department head’s refusal to recommend promotion, in December of 1969, contemporaneously with the promotion committee meetings, Dr. Winsey was characterized as "troublesome” by the Dean and her department head. They began keeping detailed memoranda of conversations with her, and the department head testified that he then thought of offering Dr. Winsey a terminal contract, that is, one with a clause terminating her employment in one year. In a conversation about Dr. Winsey during the first week of January, 1970 among an executive vice-president of Pace, the Dean, and the head of Dr. Winsey’s department, the vice-president advised Dr. Winsey’s department head that the best thing to do was to get rid of any "troublemaker”.
On February 26, 1970, Dr. Winsey was informed by her department head that she was receiving a terminal contract for the 1970-1971 academic year. At about the same time the Dean wrote to the vice-president stating that it was unlikely that her department head would ever recommend her for tenure. On April 13, 1970, Dr. Winsey resigned. On July 9, 1970, she attempted to rescind her resignation in order to pursue grievance procedures, but her attempt was rejected.
Section Bl-9.0 of the Administrative Code provides for the usual limited judicial review of administrative findings. The findings of the commission are conclusive, if supported by "sufficient evidence” on the record considered as a whole (see Matter of River House in Riverdale Assoc. v Booth, 51 Misc 2d 403, 405-406). This provision is comparable in effect to State legislation providing for administrative regulation of unlawful discrimination in employment (see Executive Law, § 298; Matter of Mize v State Div. of Human Rights, 33 NY2d 53, 56). Such language confers power upon the commission to "appraise, correlate and evaluate the facts uncovered” (cf. Matter of Holland v Edwards, 307 NY 38, 45 [ Fuld, J.]). Hence, the sole question before the reviewing court is "whether there was sufficient evidence in the record to support the [commission’s] finding” (State Div. of Human Rights v Syracuse Univ., 46 AD2d 1002, 1002-1003; see, also, State Div. of Human Rights v *36 New York-Pennsylvania Professional Baseball League, 36 AD2d 364, 371, affd 29 NY2d 921).
While it is true, in the absence of direct evidence of willful discrimination, that statistics are helpful in determining whether there is an unlawful discriminatory employment practice, a statistical predicate alone, especially where there are complicating historical reasons for a statistical bias, will not support a challenge to the employer’s employment practices just because he has no or too few members of the group allegedly excluded unlawfully (see, e.g., State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 209, 212). Thus, in the Kilian case, involving as it did unintentional discrimination, it was then said by Judge Stevens (p 212): "In addition there must be proof of recruitment or employment practices in the individual case which in actual operation warrant the conclusion, based on direct evidence or rational inference, or both, that there is a constructive, if unintended, discriminatory practice”. On this record, there is little more than historically biased statistical evidence to support a finding of a pattern of discrimination.
It is fallacious in statistical analysis of unlawful employment practices to draw purportedly proper employment ratios from a large group without limiting the group to those eligible for hiring or appointment. Pace asserts that the number of women who attained doctorates in the Nation between 1968 and 1970 was 10 to 14% of doctorates in all fields. The commission asserts in its brief that 25 to 29% may be a more appropriate figure if thé statistical population (pool of available candidates) is considered to be doctorates in New York City, whatever that may mean. There is however no finding by the commission as to which, if indeed either, population or group is the correct one for determining the standard against which Pace’s performance should be evaluated.
During 1967-1972, 35% of the faculty appointed were women. To be appointed a faculty member at the rank of full, associate or assistant professor, a doctorate was prerequisite, except that holders of master’s degrees with seven years’ full-time teaching experience were eligible for appointment to the rank of assistant professor. Those with a master’s degree but without this required experience could qualify for the rank of instructor only. While it is true that faculty women selected were appointed disproportionately in the lower ranks, this conceivably could be explained by the fact that there were not *37 enough qualified women in the eligible pool or statistical population from which to choose. Since the qualifications for appointment in the higher ranking positions have not been challenged, they may be accepted for present purposes as reasonably related to a legitimate goal or "business necessity” of the employer (cf. Griggs v Duke Power Co., 401 US 424, 431). Given these prerequisite qualifications, Pace’s performance has not been shown to have been discriminatory, in purpose or effect. In short, there is insufficient evidence to support a finding that Pace’s appointment practices were discriminatory on an institution-wide basis.
To be eligible for tenure Pace required a faculty member to have been at least an assistant professor in rank. At this rank, tenure required four years of full-time teaching and a doctorate, or seven years of full-time teaching, including four years at Pace, and a master’s degree. By 1970, four women had been on the faculty long enough and qualified to attain tenure. And by the date of the commission’s order in 1972, only 8 women out of 139 faculty members had attained tenure. Approximately 17% of the faculty women were tenured, as compared with approximately 73% of faculty men. But this comparison must be examined against the insufficiently-defined pool of eligibles, the effect of contraction of the faculty, and, of course, the historical bias which may have limited the pool of eligible women candidates to begin with.
The commission relied largely on the "turnover” rate, that is the displacement of faculty members before they could attain sufficient seniority to be eligible for tenure, to establish a discriminatory practice as to tenure and promotion. The commission defined the rate of "turnover” as the ratio of the number of staff for the year in question to the sum of the new staff appointed for that year plus the staff on hand at the end of the preceding year. It calculated "turnover” rates for men and women on the faculty separately. Whether a "turnover rate”, without more, is a correct measure to determine existence of a practice by Pace to prevent women from becoming eligible for tenure is doubtful. The loss of one faculty woman shows up as a much greater percentage shift than the loss of one faculty man. Under these circumstances the significance of year-by-year percentage comparisons may be misleading. Nor does it give recognition to the effect of a faculty contraction, from 249 in 1970 to 226 in 1972.
Against such an inconclusive if not wholly unsatisfactory *38 analysis by the commission one must consider what other evidence there was to show that Pace had discriminatory practices in granting tenure and promotion. The commission relied upon circumstances that the department chairman had "primary jurisdiction over hiring and termination”, that there were relatively few women department heads, and upon the evidence that one department head, the head of the Speech Department, had made an explicitly discriminatory comment with regard to appointing women. True, these chairmen also relied upon all-male faculty committees to guide them in their decisions. This evidence indicative of personal condescension toward faculty women by one person in the university and the coincidence of essentially all-male decision makers does not, without more, establish a university-wide pattern of discrimination.
Consequently, however suggestive the statistical data assembled before the commission, it is insufficient to establish a pattern of discrimination on the ground of sex, either in the university at large, or the School of Arts and Sciences, or the departments concerned. This is because the data does not soundly eliminate or adjust for historical, evolutionary, or other causes influencing the statistical population or pool qualified for academic appointment, promotion or tenure which may affect the conclusions derived from the statistical formulation. To be sure, the problem is especially difficult in this or any other area where there has been historical discrimination, just because the effect of historical discrimination is to limit, in the evolutionary stages at least, the population from which to select qualified persons.
Neither the commission nor the courts should invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning (cf. New York Inst. of Technology v State Div. of Human Rights, 48 AD2d 132, mot for lv to app granted 37 NY2d 709; Faro v New York Univ., 502 F2d 1229, 1231-1232). Schools of higher learning are not "businesses” where employees are all fairly fungible unskilled or semiskilled workers (see, e.g., State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 209, supra). In a professional or academic milieu subjective judgments necessarily have a proper and legitimate role (cf. Faro v New York Univ., supra, at p 1232; see, also, Kohn v Royall, Koegel & Wells, 59 FRD 515, 521). *39 Moreover, for what it is worth, neither Dr. Winsey nor women witnesses who supported her cause had attained the objective, unchallenged qualifications for tenure and promotion. On this record there is insufficient support for the commission’s findings of institution-wide discrimination on the ground of sex.
This is not to say, however, that Pace or any other school of higher learning can never be shown on a sufficient record based on statistical data to have discriminated unlawfully on the ground of sex. Even without a showing of intentional discrimination, a statistical record which is insufficient today, by virtue of an historical development, may become sufficient tomorrow when it may be reasonable to conclude that increasing numbers of qualified women are available. Most important, the probative worth of statistics will depend in part on the context from which the statistics are drawn. Thus, raw data with reference to nonemployment or limited employment of women or minority group members in unskilled or semiskilled labor, as in the Kilian case (supra), will generally be entitled to greater significance than comparable data in professional settings where a number of entirely legitimate nondiscriminatory considerations may be shown to have affected the incidence of employment or promotion.
Nevertheless, as one turns to the particular complaint of Dr. Winsey there is sufficient evidence in the record taken as a whole which would allow a finding by the commission that a prima facie case of discrimination on the ground of sex had been made out. Thus, the burden shifted to Pace to justify the treatment of Dr. Winsey (see McDonnell Douglas Corp. v Green, 411 US 792, 802-803). There had been explicitly discriminatory comments to her or with reference to her by the head of the Speech Department and other comments by the Dean and head of the Department of Social Science indicative of sex discrimination. The fact that Dr. Winsey did not receive an appointment in the department of her primary interest, Speech, and therefore was shifted to the new Department of Social Science was suggestive of the discrimination which had been indeed expressed. It was not unreasonable, therefore, for the commission to conclude that similar attitudes were held by those men who reviewed Dr. Winsey’s application or at least that they were influenced by comments and attitudes that had their origin in unlawful discrimination, whether conscious or not. Her termination, therefore, may have been the product of such comments and attitudes. The evidence *40 could have been interpreted otherwise; but be that as it may, the commission’s interpretation is reasonable and sufficiently supported by the evidence. Hence, it was appropriate for the commission to weigh Pace’s justification against a prima facie case of discrimination.
Any justification would require a showing that the employee was terminated for some independently legitimate reason which was neither a pretext for discrimination nor was substantially influenced by impermissible discrimination (cf. Bache & Co. v State Div. of Human Rights, 35 AD2d 928, 929, affd 31 NY2d 1021). Pace asserts that it was just because Dr. Winsey was a "troublemaker” that she was terminated, with some reference to lack of publication and her not satisfying some of the minimal requirements in a faculty handbook which Dr. Winsey denied knowing about until after her failure to receive a promotion. Yet it is not controverted that what Dr. Winsey did in seeking promotion was not out of the ordinary course for faculty men. What became apparent is that she was a "troublesome” woman. What Dr. Winsey did to cause her termination would not have been considered "troublesome” if she had not been a woman. It often happens that those who are not supine and fight for their rights will be regarded as troublesome and those disturbed by the struggle would wish that the troublesome one "would just go away”. To terminate Dr. Winsey’s employment for this reason, if that were the reason, is to have unlawfully discriminated against her.
Consequently, while there is disputed evidence and equivocal circumstances surrounding Dr. Winsey’s failure to achieve promotion or tenure, it was the province of the commission to weigh the evidence, make the permissible inferences, and to come to conclusions supported by the evidence.
It is also wise to advert, as did Judge Fuld in Matter of Holland v Edwards (307 NY 38, 45, supra) to the common experience that those who discriminate unlawfully are not likely to do so in open, plainly-appearing fashion (see, also, Matter of National Organization for Women v State Div. of Human Rights, 34 NY2d 416, 420). Instead, there is likely to be covert resort to subtle tactics and the pretext of intermingled motives and reasons to obscure the substantial cause. The evidence about Dr. Winsey’s nonpromotion was just of that character, resting in part on slips of the tongue, jests with a serious half-hidden barb, inconsistent handling, and then a smoke screen, perhaps, of obscuring lawful motivations and *41 reasons for denying her promotion. At least, the commission could so find, and it did.
Accordingly, the order of the Appellate Division should be modified, without costs, and the matter remitted to the Supreme Court with directions to remand to the commission, in the light of this opinion, to make new findings and appropriate determinations with respect to the complaint of Dr. Winsey as an individual that she was unlawfully discriminated against on the ground of sex.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified, without costs, and matter remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.