Catherine T. MURPHY, Patricia Murphy, Michael Ugliarolo, and Susan Ugliarolo, Plaintiffs,

v.

253 GARTH TENANTS CORP., and Edward Odesser, Defendants.

No. 82 Civ. 8281 (RWS).

United States District Court, S.D. New York.

Sept. 28, 1983.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for plaintiffs; C. Daniel Chill, Franklin R. Kaiman, New York City, of counsel.

Pollner, Mezan & Stolzberg, New York City, for defendants; William M. Pinzler, New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiffs Catherine T. Murphy ("Catherine"), her daughter Patricia Murphy ("Patricia") and Michael Ugliarolo and Susan Franzino Ugliarolo (the "Ugliarolos") have initiated this action against defendants 253 Garth Tenants Corp. (the "Cooperative") and its President Edward Odesser ("Odesser"), alleging that the Cooperative and Odesser discriminated against Catherine and Patricia in refusing to approve the transfer of the Ugliarolo's shares in the Cooperative to either Catherine or Patricia in violation of 42 U.S.C.A. §§ 3601–3631, an allegation denied by the Cooperative and Odesser. The action was tried before the court and upon the following findings of fact and conclusions of law, judgment will be entered granting the relief sought in the complaint.

This unfortunate, painful and uncompromisable action presents squarely two difficult questions, one of fact and one of law. The first is whether or not the defendants have presented credible evidence to estab-

lish a negative, namely, that their decision to deny Catherine or Patricia the right to acquire the shares of the Cooperative was not based on sex or national origin. The second is whether, as a matter of law, a subjective, nondiscriminatory reason for denial of the right to acquire shares in a cooperative can defeat a prima facie claim of discrimination against Catherine on the grounds that she is female and was born in Ireland. These difficult issues were presented concisely and with force by very able advocates in a one-day proceeding. Because I conclude that my findings with respect to the credibility of the witnesses are controlling, the complaint will be dismissed.

Catherine and Joseph Murphy were married for thirteen years and had five children, one of the eldest of which was Patricia. A divorce occurred, and Joseph and Jo Ann Murphy have been married for the past twelve years. Jo Ann is in the real estate business. Despite the divorce, according to counsel, the Murphys are an "extended family." As Joseph Murphy testified by deposition: [1]

> You see, obviously, I am in a number of businesses, banking business, real estate business, internationally and domestically, and I also have a very substantial, myself, net worth and fairly diversified business.
>
> My wife Jo Ann has two businesses up in Scarsdale, a real estate business and an antique shop, and we have a family partnership which we use for securities and so on and so forth.
>
> My wife Catherine, my former wife Catherine, and I have five children and I have just taken it upon myself with, I guess, everybody's consent over a long period of time to manage entirely the affairs of the group, including their residences and their houses and so on and so forth.
>
> We have had a number of different houses as the children have gone away to college and three of them have now graduated from college and one is going to graduate school and the fourth one is about to graduate. We have attempted to make arrangements through Jo Ann for various places of abode, either giving them the option of coming back to the home, which I don't think that they would be very interested in, or locating them somewhere around the area of Scarsdale.
>
> . . . .
>
> So part of the confusion regarding finance is related to the complexity of my own financial structure, which is family partnerships and different pieces of real estate that I own, different companies that I'm involved with.
>
> I probably own five or six, seven different companies. All of those are managed by Jo Ann. I mean the finances of them are managed by Jo Ann and the cash management is centrally managed by Jo Ann, some of it through a bookkeeper in her office, some of it through an accountant which is a separate accountant.
>
> So, for instance, when Catherine wants money, we just deposit it automatically into her account. Every week we deposit to the kids' account. We make deposits to—the kids own real estate directly themselves. They receive distributions which I sign the checks for and go into their accounts.
>
> So it's a centralized management system which some of them may or may not be aware of, you know, where and how the funds are circulated or coming from.
>
> We have a family partnership account which I set up last year, which effectively does the same thing. When they receive cash, I put it into the family partnership and I centralize the administration of it.
>
> Real estate, my net worth is well in excess of seven figures and probably eight figures or more. So I need a very sophisticated system in order to handle this. But one of my goals has been to

---

**1.** Jo Ann was the only Murphy to testify at trial and she testified only as to an initial conversation with a Board member concerning the apartment.

try to keep everybody living around that Scarsdale area and provide for them.

So when things like apartments come up, Catherine need not be aware of Jo Ann being out in the market looking at or looking for apartments or attempting to find places to live and this is, let's say, the third house that we have had in the area that we are in right now, all of which Jo Ann has either bought or sold or traded or whatever.

So it's a central-managed system and, again, maybe it sounds kind of unusual, but it works.

Through Susan Ugliarolo,[2] Jo Ann learned that the Ugliarolo's apartment was available on favorable terms, and she took steps to obtain the Ugliarolo's apartment for Catherine's use.

The apartment was number 3M in the Cooperative, a cooperative housing corporation which owns the building at 253 Garth Road, Scarsdale. The Cooperative had been converted to cooperative ownership on January 1, 1982, its first Board meeting was held on February 5, 1982 and thereafter committees were set up. One of these was the sublets and transfers committee, which was made up of three members of the Board of Directors—Odesser, who is a lawyer and president of the Cooperative, June Konopka, who is employed in the medical profession, and Jay Hornstein, who is engaged in the retail liquor business. Of course, all the Board members own shares in the Cooperative and hold proprietary leases.

The by-laws of the Cooperative provide in Article VI § 4 that:

The shares may be transferred only after consent of the Board of Directors, which consent shall not be unreasonably withheld ...

Shortly after the Cooperative was organized, Jo Ann Murphy learned of the availability of the Ugliarolos' apartment, and on January 4, 1982 the Ugliarolos entered into a contract to sell their shares and assign their lease to Catherine. An Application for Purchase of Shares (the "Application")

was forwarded to Catherine. She filled it out and returned it on February 24, 1982. The form of the Application was determined by the Cooperative's then agent, the North American Group.

The Application requested information concerning Catherine's "martial" (sic) status and the word "divorced" was filled in. Other application forms used by the agent also requested information concerning place of birth of the applicant, although the form filled out by Catherine did not. It is conceded, however, that her country of birth was Ireland. Her executed Application is annexed as Appendix 1.

On March 9, 1982 the transfer committee interviewed Catherine, who was accompanied by her daughter. At the interview, she was uncertain as to what she intended to do with her existing apartment, did not know the persons who had been listed as references, and was uncertain with respect to questions concerning finances, bank accounts and available funds. Additional information was requested.

Joseph Murphy, by a letter dated March 14, 1982, answered the financial questions and listed two additional references, Ms. Kraft and Mrs. MacGillivray, who were contacted by Mrs. Konopka. Both told Mrs. Konopka their primary knowledge of Catherine was derived from their relationship with Patricia and Patricia's relationship with Mrs. MacGillivray's son. No negative information was conveyed in these conversations.

The transfer committee met and voted to recommend to the Board to reject Catherine's Application on the ground that she was unresponsive and that her answers during the interview were vague. On April 15, 1982 the Board adopted the recommendation of the committee and so advised Catherine.

Another application by Catherine dated May 17, 1982 was rejected by the Board without further interview or action. This application requested information concerning Catherine's place of birth which was

2. Susan Ugliarolo's mother was Jo Ann's employee.

filled out as having been Ireland. David Clurman, a prominent lawyer, wrote to Mr. Odesser on the Murphys' behalf urging the transfer. In September, 1982 the Ugliarolos entered into a contract to sell shares and assign the proprietary lease to Patricia who then on September 27, 1982 applied to the Board for approval to transfer the shares. At her interview, Patricia indicated her willingness, notwithstanding the provisions of the proprietary lease, to provide a writing to the effect that Catherine would not live in the apartment. By letter of November 18, 1982, the Board notified the Ugliarolos that consent to the transfer would be withheld. At trial, the Board members testified that they believed the apartment would have been used by Catherine.

The members of the Board stated that there were three criteria to be met by an applicant seeking transfer of shares of the Cooperative and assignment of the proprietary lease: whether or not the applicant intends to live in the apartment, the applicant's financial capacity and whether the applicant would be a good neighbor, congenial and peaceful, fitting in with the image of the Cooperative. From the time of its formation to the present the Cooperative has rejected three applicants in addition to the Murphys—Vincenzo Aglialoro, because he already had an apartment and the second apartment was sought for investment, Frank and Frances Meehan who sought an apartment for their son and daughter-in-law, whose resources were deemed inadequate, and Paul Colonna who withdrew the application on discovering the Cooperatives rules for subletting. Mr. Ugliarolo was born in Italy and the senior Meehan in Ireland. Eighteen other applications for transfer were granted to persons whose names indicate Italian, Irish and Asian origins and various religious persuasions. At least four of these appear to be single women.

All the Board members testified and all denied that their rejection of Catherine and Patricia related to their national origin or marital status. I find that testimony to be credible. Later application forms omitted the marital status and national original questions.

The reason the Board members gave for the denial of permission to transfer was Catherine's unresponsiveness and vagueness and the Board's belief that if Patricia obtained the apartment, Catherine would occupy it. Given the deposition testimony of Joseph Murphy referred to above, it seems possible that Catherine would have occupied the apartment had Patricia obtained it, but at the time the Board did not know of the Murphys' practice of intrafamilial sharing of real estate holdings. Therefore, in support of its denial of transfer, the Cooperative must rely on its preference for shareholders who will be good neighbors and its conclusion that Catherine was unresponsive and vague during her interview. The Board relied on the subjective judgment of its committee without requiring an articulated, objective basis for the rejection, even though such a reasoned, objective basis would have been possible.

■ Quite obviously, as skilled counsel all agreed, the starting point for analysis of the Fair Housing Act claim is *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir.1979), since it is established that this court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 3612, and venue under 28 U.S.C. § 1391. Because she is a woman and is of Irish origin, Catherine is a member of a protected class under 42 U.S.C. § 3604. This fact, combined with the fact that Catherine was rejected for a housing opportunity that remained available, establish a prima facie case under *Robinson*. 610 F.2d at 1038.

■ However, Odesser and the Cooperative have convinced me that their intent was not discriminatory but instead was based on subjective, non-discriminatory reasons. Catherine and Patricia did not testify and no evidence other than that referred to above was offered to establish that Odesser and the Cooperative's explanation for their acts was pretextual.

In *Robinson v. 12 Lofts Realty, Inc.*, the court said:

In sum, therefore, in order for the corporation to prevail, the district court

must find that racial motivation did not play any role in the decision to deny Robinson's application. In its deliberations, the court must remember that "clever men may easily conceal their motivations." *United States v. City of Black Jack, supra,* 508 F.2d [1179] at 1185 [(8th Cir.1974)]. "As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared." *Village of Arlington Heights II, supra,* 558 F.2d [1283] at 1290 [(7th Cir.1977)]. It means that when a "discriminatory effect is present, the court must be alert to recognize means that are subtle and explanations that are synthetic.

In the final analysis, the court should bear in mind that throughout, Hanley has been willing to sell ⅔ of his floor to Robinson, only to be thwarted by the corporation. We should be especially chary of permitting a third party to prevent, on the basis of easily fabricated subjective factors, a sale of housing by a willing seller to an objectively acceptable buyer.

610 F.2d at 1043.

The explanation given by the defendants here is neither subtle or synthetic. It is a subjective discomfort with Catherine and Patricia as tenants; the discomfort is based upon the interview and is not related to a discriminatory purpose. While the inference to be drawn from the 1982 Application form used by the agent for the building seeking information concerning place of birth is evident and unfortunate, it is not irrebuttable. It is in fact rebutted by the testimony of the Board members and the Board's subsequent revision of the Application forms.

In the Board's view, Patricia's application stood or fell with Catherine's. They chose not to restrict or alter the proprietary lease so as to prevent Catherine's use of the apartment. This decision was made not for a proscribed reason, but upon a subjective evaluation of the unknown kind of tenancy which would result as a consequence of Catherine's vague and unresponsive answers.

Of course, pendent jurisdiction exists. *United Mineworkers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Plaintiffs' state law cause of action is brought under N.Y.Exec.Law § 296(5)(a) which states:

> It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof:
>
> (1) To refuse to sell, rent, lease or otherwise to deny to or withhold from any person or group of persons such a housing accommodation because of the race, creed, color, national origin, sex, or disability or marital status of such person or persons.

The New York Court of Appeals has interpreted this antidiscrimination law to require a defendant, once a prima facie case of discrimination has been established, to make a showing that the allegedly discriminatory act was done "for some independently legitimate reason which was neither a pretext for discrimination nor was substantially influenced by impermissible discrimination." *New York City Board of Education v. Batista,* 54 N.Y.2d 379, 446 N.Y.S.2d 1, 3 n., 430 N.E.2d 877 (Ct.App. 1981) (quoting *Pace College v. Commission on Human Rights,* 38 N.Y.2d 28, 377 N.Y.S.2d 471, 339 N.E.2d 880 (Ct.App. 1975). For the reasons set forth above, I conclude that there has been a failure to establish discrimination under state law as well as federal.

However, the Cooperative bound itself to the Ugliarolos, who were nominal plaintiffs, to meet a different standard, namely, that the consent to transfer would not "unreasonably" be withheld. The By-Laws of the Cooperative provide that:

> The shares may be transferred only after consent of the Board of Directors, which consent shall not unreasonably be withheld ....

The proprietary lease under which the Ugliarolos hold their apartment, however, states a different standard:

There shall be no limitation ... on the right of the Directors or lessees to grant or withhold consent, for any reason or for no reason, to an assignment.

■ The conflict between these two provisions must be resolved in favor of the by-laws. In *Brennan v. Breezy Point Cooperative, Inc.*, N.Y.L.J. March 17, 1982, at 14, col. 1 (Sup.Ct.), the voting requirements contained in a cooperative's by-laws for amendment of the cooperative's proprietary lease were different from those contained in the lease itself. The court determined that the requirements in the by-laws would control, reasoning that since the voting right arises directly out of the corporation-shareholder relationship, the by-laws, which are the rules for that relationship, should govern. Here, the right to transfer shares is similarly an inherent part of the corporation-shareholder relationship. In addition, the Cooperative's by-laws provide that the right to occupy the apartment passes automatically with, Art. I, § 1 and is conditioned on, Art. V, § 3, transfer of the shares. It is thus clear that when shares are transferred and the related lease is assigned, the share transfer is the dominant aspect of the transaction, and the by-laws, which govern the rights and restrictions associated with the shares, should control.

■ The Cooperative's promise that the consent to transfer shares would not "unreasonably" be withheld requires something more than the subjective explanation permissible under the antidiscrimination laws, since by its very language the "unreasonable" term invokes an objective, third-party standard. New York courts have interpreted such clauses to require standards that are:

readily measurable of a proposed subtenant's or assignee's acceptability from the viewpoint of any landlord, including:

(a) financial responsibility,

(b) the "identity" or "business character" of the subtenant, including suitability for the particular building,

(c) legality of the proposed use,

(d) nature of the occupancy.

*Kruger v. Page Management Co., Inc.*, 105 Misc.2d 14, 432 N.Y.S.2d 295, 302 (Sup.Ct. 1980). By contrast, reasons based on "the landlord's supposed needs, dislikes, personal taste, sensibility or convenience ... generally result in judicial disapproval." *Kruger*, 432 N.Y.S.2d at 302. *See also Lapidus v. Melohn Properties*, No. 6917/82 (N.Y.Sup.Ct. Apr. 27, 1982), slip op. at 2; *Solow Management v. Krichene*, N.Y.L.J., Aug. 13, 1982, at 14, col. 4 (N.Y. C.Civ.Ct.).

The reasons the Board members supplied for rejection of Catherine as a tenant fail to rise to the standard of objectively established in these cases. Admittedly, the Board's articulated policy of seeking tenants who will be "good neighbors" points toward the use of an objective standard. But the explanation the Board members gave for the denial—Catherine's "vagueness" and "unresponsiveness" to questions—is subjective and unreasonable, especially when the Board members admitted that Catherine was "peaceful" and "pleasant," and was not "disharmonious." On this basis, Catherine is entitled to the judgment granting the injunctive relief she seeks together with the costs and disbursements. Settle judgment on notice.

**IT IS SO ORDERED.**

Application for Purchase of Shares

*253 GARTH TENANTS CORP.*

Date: 2/24/82
Name(s) of Seller: MICHAEL UGLIAROLO + SUSAN FRANZINO

Apt. No.: 3M
Business Phone: _____

No. Of Shares: 554
Maintenance: 263.15

Names(s) of Applicant: 1) _CATHERINE T. MURPHY_
Citizenship: _- 723-766.3_ 2) S.S. No. _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_

Citizenship: _____ S.S. No. _____
Current Address: _370 CENTRAL PARK AVENUE, SCARSDALE, N.Y. 10583_
Business Phone: _____
Martial Status: _DIVORCED_ No. of Children: _5_
Check One: Rent _✓_ Owner _____ Other _____
If Renting, Name & Address of Present Landlord: _EDGEMONT ASSOCIATES_
_370 CENTRAL PARK AVE_
Phone No.: _472-1960_ _SCARSDALE_
(If length of residence is less than 2 years, give name and address of previous landlord below:)
Landlord: _____
Phone No.: _____

Persons to Reside in Apartment:

| Name | Relationship | Birth Date |
|------|-------------|-----------|
| 1) _SELF_ | | |
| 2) | | |
| 3) | | |
| 4) | | |

(I understand that no pets are permitted.)

Employment Information: All applicants; include self employment.

| Present Employer/ Address | Position/ Occupation | Length of Employment | Current Salary |
|------|------|------|------|
| 1) _NOT EMPLOYED_ | | | |
| 2) | | | |
| 3) | | | |

(If less than two years with present employer, give name and address of previous employer.)
1)
2)

List other Sources of Income:

| Name | Source | Annual Income |
|------|--------|---------------|
| 1) _Joseph M. Murphy_ | _ALIMONY_ | _$24,000._ |
| 2) | | |
| 3) | | |

Total Current Income from All Services: $ ___ — ___

Purchase Price: $ _40,000_ Downpayment: $ _4,000_
(A COPY OF THE CONTRACT OF SALE MUST ACCOMPANY APPLICATION.)

_Atty same for purchaser as seller_

Mortgage: Bank _____ Term _____ Interest % _____
Monthly Payments: $ _____
List anyone other than applicant co-signing for this loan:
1)
2)

List below current Bank Accounts:
1) Name: _SCARSDALE NAT'L BANK_   Checking Bal.: $ _____
   Branch: _EAST PKWY-_   Savings Bal.: $ _____
2) Name: _SCARSDALE_   Checking Bal.: $ _____
   Branch: _____   Savings Bal.: $ _____

Indicate source of downpayment and closing costs:
1) Source: _SALE OF HOUSE_ Amount: $ _40,000_
2) Source: _____ Amount: $ _____

List below debts including, but not limited to, home mortgage, car, appliance, school loans, etc.:
1)
2)
3)
4)

Have you ever filed for bankruptcy?  Applicant  Co-Applicant
Yes____ No __✓__  Yes____ No____

If so when and where:_____

Have you any outstanding judgements? Yes____ No __✓__  Yes____ No____
Are you a party in a law suit?  Yes____ No __✓__  Yes____ No____
If applicant(s) answers yes to any of the above, an explanation is to be attached.

Business References:

    Name                 Occupation            Phone No.
1)
2)

Personal References (other than Relatives):

    Name                 Occupation            Phone No.
1) Roger Greene          Attorney           212-757-3516
2) Tom McCaughey     Investment Banker   212-747-7243-

I certify statements made in this application have been examined by me and to the best of my knowledge and belief are true, correct and complete. I have no objection to inquiries to any person or institution being made for the purpose of verifying the facts herein stated. I have received and reviewed copies of the Proprietary Lease and the House Rules and are prepared to accept them as obligations of stock ownership and residence. I understand that the filing of this application does not in any way bind the Cooperative Corporation to consent to the assignment of this apartment to me.

Purchaser's Signature   Date 2/25/83          Date_____
Co-Purchaser's Signature