PATRICIA HINFEY, JACQUELYN WALKER FOR MON-
MOUTH COUNTY N.O.W., COMPLAINANTS-APPELLANTS,
v. MATAWAN REGIONAL BOARD OF EDUCATION *ET
AL.*, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 30, 1976—Decided January 21, 1977.

Before Judges CRANE, MICHELS and PRESSLER.

*Ms. Nadine Taub,* attorney for appellants.

*Mr. William F. Hyland,* attorney for respondent Director of the Division on Civil Rights (*Ms. Mary Ann Burgess,* of counsel and on the brief).

*Mr. Edward Parker* filed a brief on behalf of the *amici curiae,* Congresso Boricua De New Jersey and American Civil Liberties Union of New Jersey.

The opinion of the court was delivered by

PRESSLER, J. S. C., Temporarily Assigned. [1] The issue raised by this appeal is whether the enactment by the Legislature in 1973 of *N. J. S. A.* 18A:36–20[1] divested the Division on Civil Rights (Division) of its adjudicatory and enforcement jurisdiction over acts of discrimination committed by school districts in their status as public accommodations. The Director of the Division (Director) so held, relying on a formal opinion of the Attorney General, F.O. 1975 No. 28, which determined that that statute conferred exclusive jurisdiction over such controversies upon the Commissioner of Education (Commissioner). We disagree and conclude that the import of the *Title* 18A enactment was merely to confirm the concurrent jurisdiction of the Commissioner without any abrogation or diminution of the continuing jurisdiction of the Division accorded by the Law Against Discrimination, *N. J. S. A.* 10:5–1 *et seq.*

The factual and procedural context in which this jurisdictional question arises has its genesis in early 1973 when various county chapters of the New Jersey branch of the National Organization for Women began filing complaints with the Division on Civil Rights against local school districts alleging proscribed sex discrimination in curriculum assignments, employment practices and the availability of other school advantages and facilities.[2] The Director of the Division made an initial determination that he had subject matter jurisdiction to proceed pursuant to the express pro-

[1]That section provides in full as follows: "No pupil in a public school in this State shall be discriminated against in admission to, or in obtaining any advantages, privileges or courses of study of the school by reason of race, color, creed, sex or national origin."

[2]The gravamen of the complaints went to such matters as sex-segregated and unequal physical education courses, sex-segregated shop and home economics courses, sex-segregated extra-curricular offerings and sex-determined hiring and advancement of physical education teachers.

visions of the Law Against Discrimination.[3] By the end of 1974 over 40 such complaints had been filed, including the complaint of the complainants here, which charged respondents with unlawful sex-discriminatory practices, both as employers and as offerors of public accommodations.[4] By October 1975 some of the cases had already been terminated by the entry of consent orders by which the respective respondents undertook to take corrective action. The remaining 40 cases, including the instant controversy, were in various stages of *quasi*-judicial processing, ranging from the awaiting of a probable cause finding, pursuant to *N. J. S. A.* 10:5–14, to the awaiting of assignment of a public hearing date. On October 15, 1975, pursuant to a request made of him by the Director, the Attorney General delivered the formal opinion heretofore referred to. Accordingly, the Director in November 1975, by separate order entered in each of the 40 cases, transferred all of them, to the extent curriculum issues were raised therein, to the Department of Education for completion. All complainants, including those here, filed notices of appeal from that administrative action. By interlocutory order heretofore entered by this court, the appeal from the transfer order in respect of the Hinfey complaint is being separately prosecuted; the other 39 cases have been consolidated for appeal purposes and are presently pending in this court.

---

[3]On April 10, 1973 the Director of the Division wrote to one of the first complainants and advised her that the Division had decided to retain jurisdiction despite the question raised (without specifying by whom) as to whether the complaint "should best be processed by the Division or by the State Department of Education."

[4]The Hinfey complaint charges among other things, that the athletic program offered by the Matawan school system is unduly sex-segregated and offers greater advantages both to boys and to male physical education teachers; that the Matawan Region Board of Education excludes women from high-echelon administrative positions, discriminates between male and female staff by according maternity but not paternity leaves, and reinforces sex-stereotyping in other curriculum and textbook requirements.

■ We are persuaded that the opinion of the Attorney General, which motivated the action of the Director here appealed from, misconstrued the scope of *N. J. S. A.* 18A:36–20 and misconceived the history, import and public policy of the Law Against Discrimination. The legal principle upon which the Attorney General relied is the canon of statutory construction by which a later special law is deemed to repeal by implication an earlier general one addressed to the same subject. We do not quarrel with the viability of that principle but rather with its application here. We do not view those provisions of the Law Against Discrimination which confer jurisdiction upon the Division on Civil Rights in respect of school districts to be general at all. Indeed, we view them as considerably more specific than *N. J. S. A.* 18A:36–20. Thus, *N. J. S. A.* 10:5–4 expressly declares as a civil right the opportunity "to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation" without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex. A place of public accommodation is defined by *N. J. S. A.* 10:5–5 as specifically including "any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey." *N. J. S. A.* 10:5–6, which creates the Division, also confers upon it "general jurisdiction and authority" to "prevent and eliminate discrimination in the manner prohibited by this act."

■ There are, further, essential public policy considerations as well which constrain us to conclude that *N. J. S. A.* 18A:36–20 was neither intended to repeal the Division's jurisdictional grant nor should be construed to have done so. The Law Against Discrimination is based upon the express legislative finding that discriminatory conduct prohibited by the Act "threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions

and foundation of a free democratic State * * * ." *N. J. S. A.* 10:5–3. The act, whose purpose is to eradicate such invidious discrimination, is thus a cornerstone of our fundamental social and political philosophy which demands assiduous and solicitous protection from casual or unintended erosion. Indeed, the entire legislative history of this act has been one of continual enlargement of the power and jurisdiction of the Division to enable it more readily to discharge its awesome responsibilities in the quest for a just society.[5] The

[5]The Law Against Discrimination was first enacted in 1945 as *N. J. S. A.* 18:25–1, creating the Division against Discrimination within the State Department of Education. This Division, the first enforcement agency, was empowered only to eliminate employment discrimination. In 1949, as a result of the legislative intention to combine existing civil rights legislation and the Law Against Discrimination, the Division's power was extended to include jurisdiction over discrimination in educational institutions and places of public accommodation based on race, creed, color, national origin or ancestry *L.* 1949, *c.* 11. In 1950 discrimination in public housing was added, *L.* 1950, *c.* 105, although enforcement power in respect thereof was not conferred on the Division until 1954. *L.* 1954, *c.* 198. The law was further extended to encompass "publicly assisted" housing by *L.* 1957, *c.* 66, and some privately financed housing by *L.* 1961, *c.* 106. In 1962 age, in designated areas, was added as a proscribed basis of discrimination. *L.* 1962, *c.* 37. In 1961, the Division against Discrimination was renamed the Division on Civil Rights *L.* 1961, *c.* 106, § 3, and two years later it was removed from the Department of Education and transferred to the Department of Law and Public Safety. It was then that the Law Against Discrimination became *N. J. S. A.* 10:5–1 *et seq.*, and supervisory authority transferred from the Commissioner of Education to the Attorney General and his appointee, the Director of the Division on Civil Rights. The Division's jurisdiction was further then expanded by permitting its acceptance of complaints by designated public officials as well as from individual complainants. *L.* 1963, *c.* 40, § 7. In 1966 the Attorney General was empowered to proceed in a summary manner in the Superior Court to compel compliance with Division orders. *L.* 1966, *c.* 17; *N. J. S. A.* 10:5–14. In 1970 sex and marital status were added as proscribed bases of discrimination. *L.* 1970, *c.* 80, and physical handicap was so included in 1972. *L.* 1972, *c.* 114, § 2; *N. J. S. A.* 10:5–4.1. In 1975 loan and credit agencies and real estate operators joined banking institutions as within the purview of the act. (*L.* 1975, *c.* 35, § 1). See further, Blumrosen,

judicial construction of the act has been concomitantly liberal and to the same end.[6] We, therefore, cannot read *N. J. S. A.* 18A:36–20, essentially a broad and general policy statement, as constituting an intended first reversal of a 31-year history of expanding jurisdiction.[7]

We note that *N. J. S. A.* 18A:6–9 accords the Commissioner jurisdiction to hear and determine all disputes arising under the school laws. This jurisdictional scope is interpreted as necessarily extending as well to the general policies implicit in the school laws and their state constitutional underpinnings, including, of course, the firm anti-discrimination policy to which this State is irrevocably committed — an anti-discrimination policy which is defined by the content

---

"Antidiscrimination Laws in Action: A Law-Sociology Study," 19 *Rutgers L. Rev.* 187 (1965).

[6]See, *e. g., Passaic Daily News v. Blair*, 63 *N. J.* 474 (1973); *Zahorian v. Russell Fitt Real Estate Agency*, 62 *N. J.* 399 (1973); *Jackson v. Concord*, 54 *N. J.* 113 (1969); *Clover Hill Swimming Club v. Goldsboro*, 47 *N. J.* 25 (1966); *Fraser v. Robin Dee Camp*, 44 *N. J.* 480 (1965); *Jones v. Haridor Realty Corp.*, 37 *N. J.* 384 (1962); *Levitt and Sons, Inc. v. Div. Against Discrimination*, 31 *N. J.* 514 (1960); *National Org. for Women v. Little League Baseball*, 127 *N. J. Super.* 522 (1974), aff'd 67 *N. J.* 320 (1974).

[7]New Jersey has a long history of legislation addressed to discrimination. As early as 1881 it was unlawful to exclude a child from any public school because of race. *L.* 1881, *c.* 149. The original Civil Rights Act (Act), enacted in 1884, *L.* 1884, *c.* 219, § 1, provided that all persons were entitled to enjoyment of places of public accommodation and amusement "subject only to the conditions and limitations established by law and applicable alike to citizens of every race and color, regardless of any previous condition of servitude." In 1917 the act was amended to include a comprehensive definition of places of "public accommodation, resort or amusement." *L.* 1917, *c.* 106. In 1921 additional places were added and publication of advertisements indicating accommodations would be denied to persons because of race, color or creed was prohibited. *L.* 1921, *c.* 174. The act, as amended, was incorporated into the *Revision of* 1937 as *R. S.* 10:1–2 *et seq.* In 1945 the Legislature broadened the act to include discrimination based on national origin and ancestry. *L.* 1945, *c.* 168; *N. J. S. A.* 10:1–3, 6, 8. See fn. 5 as to the history of civil rights legislation since 1945.

of *N. J. S. A.* 10:5-1 *et seq.* See, *e.g., Booker v. Plainfield Bd. of Ed.,* 45 *N. J.* 161, 174–175 (1965); *Jenkins v. Morris Tp. School District and Bd. of Ed.,* 58 *N. J.* 483 (1971). And see *N. J. Const.* (1947), Art. I, par. 5. Accordingly, all parties concede, and quite properly so, that prior to the 1973 enactment of *N. J. S. A.* 18A:36-20 the Commissioner and the Division had concurrent *quasi*-judicial jurisdiction over all alleged acts of discrimination committed by the public schools, whether as employers or as the offerors of a public accommodation. It is also quite properly conceded here that both agencies continue to have concurrent jurisdiction in respect of alleged employment discrimination.[8] And it is further conceded here that prior to the enactment of *N. J. S. A.* 18A:36-20 the Commissioner had jurisdiction over alleged curriculum discrimination concurrent with that of the Division.

The question, then, is to ascertain, in the absence of a direct legislative statement, what the legislative intent was in enacting *N. J. S. A.* 18A:36-20. As we have said, we do not conclude that it was intended to diminish the jurisdiction of the Division on Civil Rights. The inferring of such an intention from this statute would be contrary to its own verbiage. It would, moreover, result in a conflict with the express legislative grant to the Division and the Division's primary responsibility for the elimination of all proscribed discrimination. It would also result, at least in respect of these kinds of alleged discrimination, in the complainants' loss of the special expertise, administrative mechanisms and investigative techniques developed by the Division over the years in identifying and dealing with acts of proscribed discrimination. Nor is such an interpretation required in view

---

[8]See, similarly so holding, *Maloff v. City Comm'n on Human Rights,* 38 *N. Y.* 2d 329, 379 *N. Y. S.* 2d 788, 342 *N. E.* 2d 563 (Ct. App. 1975); *Board of Ed., etc. v. State Div. of Hum. Rights,* 42 *A. D.* 2d 473, 349 *N. Y. S.* 2d 25 (App. Div. 1973); *Board of Higher Ed. of City of N. Y. v. Carter,* 14 *N. Y.* 2d 138, 250 *N. Y. S.* 2d 33, 199 *N. E.* 2d 141 (Ct. App. 1964).

of the broad area of concurrent jurisdiction theretofore exercised by the Director and the Commissioner and which will, in any case, continue to be exercised. We are, therefore, satisfied that the essential purpose of *N. J. S. A.* 18A:36–20 derives from Art. I, para. 5 of the 1947 New Jersey Constitution, which prohibits discrimination in the public schools based only on "religious principles, race, color, ancestry or national origin." It is our view that the 1973 statute was intended, laudably and certainly within the Legislature's power to so do, simply to extend the constitutional bases of proscribed discrimination in respect of student opportunities to include sex. If the constitutional provision is itself not construable as having conferred exclusive jurisdiction on the Commissioner, neither is this statute.

The final argument raised by the Attorney General derives from the promulgation by the State Board of Education of detailed regulations implementing *N. J. S. A.* 18A: 36–20, more particularly *N. J. A. C.* 6:4–1.3 and 5, and 6:8–2.2 to 2.4, inclusive. These regulations confer a broad remedial power upon the Commissioner and a broad affirmative obligation upon the school districts in order to assure equal curriculum opportunities for all pupils. The contention is that a final order of the Division granting relief to a particular complainant may well be in conflict with action taken or to be taken by either the Commissioner or a school district pursuant to these regulations. Our answer to this is that one administrative agency cannot divest another of its statutory jurisdiction by the adoption of regulations. Divestment of conferred jurisdiction is exclusively a legislative function.

Certainly, exclusive administrative agency jurisdiction may be tidier than concurrent jurisdiction exercisable by two agencies. There is, however, no principle of administrative law militating against concurrent jurisdiction, and we see no impediment thereto. Concurrent jurisdiction is, to the contrary, not an infrequent phenomenon, particularly where one of the agencies is charged with broad anti-discrim-

ination jurisdiction and the other regulates or is responsible for a particular economic or social activity in which discrimination may be practiced. See *Board of Ed., etc., v. State Div. of Hum. Rights* and *Maloof v. City Comm'n on Human Rights, supra* at fn. 8. And *cf. Neidich v. State Comm'n for Human Rights*, 53 *Misc.* 2d 984, 280 *N. Y. S.* 2d 463 (Sup. Ct. 1967) (so holding as to the New York State Commission for Human Rights and the division of the Department of State which licenses real estate salesmen).

■■ We are further satisfied that where there is concurrency of jurisdiction, it is the complainants' option to choose where they will seek relief and the agency so selected has no choice but to accept and retain jurisdiction in accordance with its statutory mandate. See, *e.g., City of S. Burlington v. Vermont Elec. Co., Inc.*, 133 *Vt.* 438, 344 *A.* 2d 19 (Sup. Ct. 1975); *Busick v. Workmen's Comp. Appeals Bd.*, 7 *Cal.* 3d 967, 104 *Cal. Rptr.* 42, 500 *P* 2d 1386, 1393 (Sup. Ct. 1972); *Lamneck v. Cain*, 154 *N. E.* 2d 99, 101 (Ohio C. P.), app. dismissed, 73 *Ohio Law Abst.* 20, 136 *N. E.* 2d 330 (*Ct. of App.* 1955). Complainants here, having opted to commence this proceeding in the Division, are entitled to continue there.

The order of transfer here appealed from is reversed.

CRANE, P. J. A. D., Temporarily Assigned, concurring. In my judgment the result we reach leaves the Division on Civil Rights and the Commissioner of Education in the unfortunate position of competitors in the area of curriculum management in the public schools.

The Commissioner is vested with the power and duty to supervise all of the schools of the State receiving support from state appropriations. *N. J. S. A.* 18A:4–23. *Jenkins v. Morris Tp. School Dist. and Bd. of Ed.*, 58 *N. J.* 483, 494 (1971). The Commissioner is also empowered to hear and determine "all controversies and disputes" arising under the school laws or under the rules of the State Board. *N. J. S. A.* 18A:6–9. Among the laws he is required to apply in

his supervision of the schools is *N. J. S. A.* 18A:36–20, which prohibits discrimination in courses of study.

The Division on Civil Rights is vested with the duty and power to prevent and eliminate discrimination in places of public accommodation, including any educational institution under the supervision of the State Board of Education or the Commissioner of Education. *N. J. S. A.* 10:5–4; *N. J. S. A.* 10:5–6.

A close examination of all the relevant statutory enactments leads to no discernible expression of legislative intention as to which enactment should control. Under those circumstances, I am content to leave resolution of the issue of where jurisdiction should be vested as a matter of sound governmental policy to that branch of government which has the essential responsibility of formulating governmental policy, namely the Legislature. I trust its attention will be called to this anomolous situation in which two independent administrative agencies have concurrent jurisdiction over the same subject matter.